IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| DAVID BRESLAU, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RUBY TUESDAY, INC., JAMES F. HYATT, STEPHEN I. SADOVE, F. LANE CARDWELL, JR., MARK W. ADDICKS, KEVIN T. CLAYON, DONALD E. HESS, BERNARD LANIGAN, JR., JEFFREY J. O'NEIL,<br><br>Defendants. | Civil Action No. _____<br><br>COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934<br><br>JURY TRIAL DEMANDED |

Plaintiff David Breslau ("Plaintiff"), by and through his attorneys, alleges the following on information and belief, except as to the allegations specifically pertaining to Plaintiff, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.  This action stems from a proposed transaction (the "Proposed Transaction" or "Merger") announced on October 16, 2017, pursuant to which Ruby Tuesday, Inc. ("Ruby Tuesday" or the "Company") will be acquired by the Atlanta-based private equity group NRD Capital Management LLC ("NRD") through its affiliates RTI Holding Company, LLC ("Holding") and Holding's wholly owned subsidiary, RTI Merger Sub, LLC ("Merger Sub").

2.  On October 16, 2017, Ruby Tuesday's Board of Directors (the "Board" or the "Individual Defendants") caused the Company to enter into an Agreement and Plan of Merger (the "Merger Agreement") with Holding and Merger Sub. Pursuant to the terms of the Merger

Agreement, Holding will purchase each issued and outstanding share of Ruby Tuesday common stock for $2.40 in cash (the "Merger Consideration"). Upon completion of the Merger, Merger Sub will merge with and into Ruby Tuesday, with Ruby Tuesday surviving the merger as a wholly owned subsidiary of Holding.

3. On October 31, 2017, Defendants (as defined below) filed a preliminary Proxy Statement on Schedule 14A with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction (the "Proxy"). As described herein, the Proxy omits certain material information with respect to the Proposed Transaction, which renders it false and misleading, in violation of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 140.14a-9 ("Rule 14a-9") promulgated thereunder.

4. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' wrongdoing described herein.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

6. This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the

exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7. Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8. Plaintiff is, and has been at all times relevant hereto, the owner of Ruby Tuesday common stock.

9. Defendant Ruby Tuesday is a Georgia corporation, with its principal executive offices located in Maryville, Tennessee. Ruby Tuesday common stock is listed on the New York Stock Exchange under the symbol "RT."

10. Defendant James F. Hyatt is the President, Chief Executive Officer, and Board member of the Company. He joined Ruby Tuesday in April 2017.

11. Defendant Stephen I. Sadove serves as the non-executive chairman of the Company. He has been a Board member since 2002.

12. Defendant F. Lane Cardwell, Jr. has served a Board member since 2012.

13. Defendant Mark W. Addicks has served as a Board member since 2014.

14. Defendant Kevin T. Clayon has served as a Board member since 2006.

15. Defendant Donald E. Hess has served as a Board member since 2014.

16. Defendant Bernard Lanigan, Jr. has served as a Board member since 2001.

17. Defendant Jeffrey J. O'Neil has served as a Board member since 2012.

18. The defendants listed in ¶¶ 10-17 are collectively referred to herein as the "Individual Defendants."

19. The Individual Defendants and Ruby Tuesday are referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

20. Founded in 1972, Ruby Tuesday owns, operates, and franchises "bar and grill" casual dining restaurants. As of September 5, 2017, there existed 599 Ruby Tuesday restaurants in 41 states and 14 foreign countries. According to its website, "Ruby Tuesday is driven by uncompromising freshness and quality, gracious hospitality and a growing list of restaurants destined to be the envy of the casual dining business." There are nearly 28,000 Ruby Tuesday "corporate and franchise team members," according to the Company.

21. In soliciting shareholder approval for the Proposed Transaction, Defendants issued the Proxy, which purports to contain a summary/overview of the Proposed Transaction, but omits certain critical information, rendering portions of the Proxy materially incomplete and/or misleading, in violation of the Securities Act provisions discussed herein. As a result, Ruby Tuesday shareholders lack material information necessary to allow them to make an informed decision concerning whether to vote in favor of the Merger.

22. In particular, the Proxy contains materially incomplete and/or misleading information concerning, *inter alia*: the financial analyses performed by Ruby Tuesday's financial advisor, UBS Securities LLC ("UBS"), in support of its fairness opinion.

23. The Proxy states that in rendering its fairness opinion, UBS performed a *Selected Public Company Analysis*. For this analysis, the Proxy notes that UBS compared Ruby Tuesday's financial data with data from four selected "public casual dining publicly traded U.S. companies. . . ." Proxy at 52. Specifically, UBS reviewed a variety of values of each of the selected companies as a multiple of next twelve months estimated EBITDA ("NTM EBITDA") of such selected company. From these analyses, UBS observed "indicated median and mean

4

enterprise value to NTM EBITDA multiples of 6.9x and 7.5x, respectively, for the Selected Companies." *Id.* UBS performed a similar analysis with respect to Ruby Tuesday, observing an enterprise value to NTM EBITDA multiple of 5.8x (based on Ruby Tuesday's closing stock price on March 13, 2016, the last trading day before its announcement of its strategic alternative review) and 6.2x (based on Ruby Tuesday's closing stock price on October 13, 2017, the last trading day before delivery of UBS's oral fairness opinion). Based on the results of these observations, UBS selected "a reference range of enterprise value to NTM EBITDA multiples of 5.8x to 7.0x and applied the range to the NTM EBITDA of Ruby Tuesday" which "resulted in a range of implied equity values of $1.74 to $2.67 per share for Ruby Tuesday common stock." *Id.*

24. The problem, however, is that the Proxy failed to disclose the multiple of each of the four selected companies, nor did it even disclose the high and low multiples from these four selected companies. The real informative value of the financial advisor's work is not in its conclusion, but in the valuation analyses that buttress that result. When a financial advisor's endorsement of the fairness of a transaction is touted to shareholders (*see* Proxy at 47), the valuation methods used to arrive at that opinion, as well as the key multiples and range of multiples used in those analyses, must also be fairly disclosed.

25. Disclosure concerning the *Selected Transactions Analysis* portion of UBS's fairness opinion fares no better. For this analysis, UBS used publicly available information relating to the 14 acquisitions involving "casual dining target companies." Proxy at 51. The Proxy notes that UBS reviewed the enterprise value of each of the 14 target companies "as a multiple of such target company's EBITDA for the prior twelve months" ("LTM EBITDA"), which UBS "determined from the date each Selected Transaction was announced." *Id.* at 51-52. From these analyses, UBS observed "median and mean enterprise value to LTM EBITDA

5

multiples of 7.8x and 7.9x, respectively, for the target companies in the Selected Transactions."
Proxy at 52. Based on this analysis, UBS then selected a reference range of enterprise value to LTM EBITDA multiples of 7.0x to 9.0x and applied the range to the LTM EBITDA of Ruby Tuesday. The analysis yielded a range of implied equity values of $1.77 to $3.12 per share for Ruby Tuesday common stock. *Id.* The Proxy, however, fails to disclose the multiples of the 14 target casual dining companies, nor does it even disclose the low and high multiples of the selected companies. *Id.*

26. The multiples for each of the 14 selected companies would be material to Ruby Tuesday shareholders in deciding how to vote their shares. As previously noted, the real value of UBS's work is not in its conclusion, but in the valuation analyses that underpin that result. It is those analyses that are crucial for shareholders evaluating the merits of the Merger.

27. The Proxy also omits material information concerning UBS's *Discounted Cash Flow Analysis* ("DCF"), which was based on "financial forecasts and estimates prepared by the management of Ruby Tuesday." Proxy at 51. The Proxy notes that, in performing its DCF, "UBS calculated ranges of implied present values (as of October 15, 2017) of the standalone, after tax, unlevered, free cash flows that Ruby Tuesday was forecasted to generate from October 15, 2017 through May 31, 2022 and of terminal values for Ruby Tuesday." *Id.* "[I]mplied terminal values were derived by applying to Ruby Tuesday's 2022 estimated unlevered, free cash flows a range of perpetuity growth rates of 1.5% to 2.5%, which range was selected based on UBS's professional judgment and expertise." *Id.* However, the Proxy fails to disclose the inputs to its terminal value range. Ruby Tuesday shareholders require a discussion as to the assumptions underlying the selection of the perpetuity growth rate range to assist them in

determining the reasonableness of, and weight to give, UBS's DCF analysis in deciding whether to vote in favor of the Merger.

28. Similarly, the Proxy notes, in connection with the DCF, that "[i]mplied present values of cash flows and terminal values were calculated using discount rates ranging from 9.5% to 10.5%, based on the estimated range of Ruby Tuesday's weighted average cost of capital ["WACC"]." Based on these calculations, UBS's DCF "resulted in a range of implied equity values of $1.43 to $2.44 per share for Ruby Tuesday common stock." Proxy at 51. However, the Proxy fails to disclose the inputs forming the estimated range of the Company's WACC.

29. The information discussed in the previous two paragraphs that Defendants omitted from the Proxy is material to Ruby Tuesday shareholders in deciding how to vote their shares, as the lack of disclosure of the inputs that were used by UBS in its DCF analysis, including the underlying inputs supporting UBS's selected WACC range and terminal value range, prevents shareholders from understanding the context of the figures or considering whether any of the inputs thereto or ranges derived therefrom are anomalous. Absent this information, Ruby Tuesday shareholders are unable to determine whether the Proposed Transaction is indeed fair and in their best interest.

30. Without the foregoing material disclosures, it is impossible for Ruby Tuesday shareholders to fully understand and interpret UBS's financial analyses or the fairness of the Merger Consideration when determining whether to vote in favor of the Proposed Transaction.

31. There are also several material omissions in the Proxy concerning the process leading up to and following the Merger.

32. For example, the Proxy does not disclose which of Ruby Tuesday's officers and directors will be retained by NRD following consummation of the Merger. It is likely that NRD,

7

a private equity firm, would, as part of its business strategy, retain certain officers and other high-ranking employees of the companies it acquires. Such information, if disclosed, would shed light on potential conflicts of interest among Ruby Tuesday's leadership. Here, the Proxy recounts discussions between the Company and at least 12 potential suitors. It is reasonable to assume that Ruby Tuesday's leadership might be biased in favor of private equity buyers (who would likely retain them post-Merger) at the expense of strategic buyers (who would more likely terminate them in order to attain synergies). Indeed, as one article concerning the Merger noted, private equity-backed "going private" deals such as this one can enrich "company executives in the short-term." Yet there is no disclosure as to whether Ruby Tuesday executives even discussed their post-Merger futures with NRD.

33. Similarly, while the Proxy does not disclose the identity of the other bidders who expressed interest in acquiring Ruby Tuesday (which is understandable), the Proxy does not even bother to disclose which bidders were strategic buyers and which were financial/private equity buyers. As noted, management often has a motive to favor private equity buyers, such as NRD, which renders this distinction material.

34. Additionally, the Proxy notes that "UBS has not in the past two years provided, and is not currently providing, financial advisory or investment banking services to Holding or its affiliates [i.e., NRD] for which UBS has received compensation." Proxy at 53. This statement, however, begs the question: whether UBS recently provided uncompensated advisory services to NRD (e.g., in connection with a "pitch" and/or as part of services in anticipation that compensated work would follow). Just like services for a fee, uncompensated work for NRD also creates a potential that UBS could be biased in favor of NRD, rather than Ruby Tuesday,

8
Case 3:17-cv-00496-HSM-CCS   Document 1   Filed 11/14/17   Page 8 of 14   PageID #: 8

which, unlike NRD, will disappear upon consummation of the Merger. Yet the Proxy is silent on the issue of uncompensated work.

## CLASS ACTION ALLEGATIONS

35. Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Ruby Tuesday (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

36. This action is properly maintainable as a class action for the following reasons:

a. The Class is so numerous that joinder of all members is impracticable. As of October 24, 2017, there were 61,186,581 shares of Ruby Tuesday common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

b. Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction; and (ii) whether Plaintiff and the Class would be irreparably harmed if the Proposed Transaction is consummated as currently contemplated and pursuant to the Proxy as currently composed.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members

of the Class which would establish incompatible standards of conduct for the party opposing the Class.

   f. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

   g. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate.

## CAUSES OF ACTION

### COUNT I
### Claim for Violation of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder
### (Against All Defendants)

37. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

38. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

39. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that solicitation communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9(a).

40. Rule 14a-9 further provides that, "[t]he fact that a proxy statement, form of proxy

or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made." 17 C.F.R. § 240.14a-9(b).

41. As discussed herein, the Proxy misrepresents and/or omits material facts concerning the Merger.

42. Defendants prepared, reviewed, filed and disseminated the false and misleading Proxy to Ruby Tuesday shareholders. In doing so, Defendants knew or recklessly disregarded that the Proxy failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

43. The omissions and incomplete and misleading statements in the Proxy are material in that a reasonable shareholder would consider them important in deciding how to vote their shares. In addition, a reasonable investor would view such information as altering the "total mix" of information made available to shareholders.

44. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Proxy, Defendants were undoubtedly aware of this information and had previously reviewed it, including participating in the Merger negotiation and sales process and reviewing UBS's complete financial analyses purportedly summarized in the Proxy.

45. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Merger.

46. Ruby Tuesday is deemed negligent as a result of the Individual Defendants'

negligence in preparing and reviewing the Proxy.

47. Defendants knew that Plaintiff and the other members of the Class would rely upon the Proxy in determining whether to vote in favor of the Merger.

48. As a direct and proximate result of Defendants' unlawful course of conduct in violation of Section 14(a) of the Exchange Act and Rule 14d-9, absent injunctive relief from the Court, Plaintiff and the other members of the Class will suffer irreparable injury by being denied the opportunity to make an informed decision as to whether to vote in favor of the Merger.

49. Plaintiff and the Class have no adequate remedy at law.

## COUNT II
### Claim for Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

50. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51. The Individual Defendants acted as controlling persons of Ruby Tuesday within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Ruby Tuesday, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

52. Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were thus directly connected with and involved in the making of the Proxy.

54. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the Exchange Act and Rule 14d-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons and the acts described herein, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

55. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

56. Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class Representative and Plaintiff's counsel as Class Counsel;

B. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C. Directing the Individual Defendants to disseminate an Amendment to its Schedule 14A that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Directing Defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 14, 2017  **WATSON BURNS, PLLC**

*s/ Frank L. Watson, III*
Frank L. Watson, , III (TN Bar. No 15073
William F. Burns, Esq. (TN Bar. No. 17908)
253 Adams Avenue
Memphis, Tennessee 38103
Tel: 901-529-7996
Fax: 901-529-7998
Email: fwatson@watsonburns.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**WOLF POPPER LLP**
Carl L. Stine
Adam J. Blander
845 Third Avenue
New York, New York 10022
Tel.: 212-759-4600
Fax: 212-486-2093
Email: cstine@wolfpopper.com
ablander@wolfpopper.com